68762. COMMERCIAL UNION INSURANCE COMPANY
v. F. R. P. COMPANY.
(322 SE2d 915)

QUILLIAN, Presiding Judge.

The defendant, Commercial Union Insurance Company, appeals from the judgment of the trial court, based upon a jury verdict for plaintiff — F. R. P. Company. Plaintiff F. R. P. was a manufacturing company which carried an insurance policy upon its machinery, refrigeration and electrical systems issued by Commercial Union. F. R. P. was in the process of manufacturing a pre-polymer product involving a reactor tank in which a coil was used to cool the chemicals as they mixed. The coil was a closed loop system which originated in a thirty thousand-gallon storage tank of methanol. The methanol was pumped from the tank through a refrigerating unit and then into a pipe leading to a three-way valve. The methanol was a coolant and was pre-cooled to a temperature of minus 18 degrees centigrade. When it arrived at the three-way valve it was either diverted into the tank to cool the chemicals as they reacted when mixed, or it was returned to the original storage tank, or the valve could send some to the reactor tank and some to the storage tank. The methanol circulated through the closed loop inside the reactor tank and then returned to the original storage tank. As the chemicals were mixed inside the reactor tank the temperature rose and the methanol cooled the mixture. The three-way valve was automatic. If the chemicals were getting too hot the valve directed a larger flow of methanol to the reactor tank. If the mixture was too cool the valve directed the flow of the methanol back to the storage tank. When the sensors determined the temperature the valve automatically opened or closed to control the flow of the methanol to the reactor to control the temper-

ature of the reaction. Although the system was automatic, an employee was present to control the process. There were gauges to show the temperature of the chemicals in the reactor tank, the flow rate of the methanol coolant and its temperature. The three-way valve is controlled by air pressure, as are the sensing gauges and graphing devices. If air pressure for these devices is lost, an alarm sounds and a light begins to flash. If air pressure is lost the three-way valve remains in a position where the methanol continues to go into the reactor rather than bypassing the reactor and returning back to the storage tank.

The three-way valve is operated by air pressure and the part that controls the position of the valve is an "O" ring gasket inside the valve. The difference in air pressure on either side of the "O" ring determines the rate and direction of flow of the methanol coolant. While mixing the chemicals, the operator saw the temperature climb sharply. He checked the flow rate for the methanol, which should have come on automatically. There was no flow rate for the methanol. He changed the methanol flow to manual but still could not start a flow of methanol into the reactor tank. He returned the control to automatic and it did not work. The temperature and the pressure rose inside the reactor tank and a safety valve — which was composed of a rupture disc — "blew." The contents of the reactor tank were directed into a spillway and lost. F. R. P. presented a claim to Commercial Union which included a claim for lost product. Commercial Union refused to pay for the lost product as they claimed there was an exception in the insurance policy which stated that the definition of "accident . . . shall not mean the functioning of any safety device or protective device." They contended that the product was lost as a result of the functioning of a safety device.

Both parties discussed the claim in detail and Commercial Union made several payments but refused to pay for the loss of the product. F. R. P. brought this action on September 2, 1982. The accident occurred on December 6, 1980. The insurance contract carried a limitation of 14 months within which an action could be brought on the policy. This action was filed more than 20 months after the incident. Defendant's Motion for Directed Verdict was denied. Following verdict and judgment for plaintiff, defendant brings this appeal. *Held*:

1. Commercial Union contends this action was barred by the contract limitation of 14 months within which an action could be brought on the policy. F. R. P. argues that the conduct of the insurer constituted a waiver, or estoppel, of any provision in the policy as to a limitation of time for instituting suit, and such question should be submitted to the jury.

The contract limitation of time to bring an action against the insurer in an insurance policy is valid and binding. However, "such pro-

vision may be waived by the conduct of the insurance company in continuing negotiations or otherwise inducing the insured to believe that reliance on the policy provision will not be forthcoming." *Lee v. Safeco Ins. Co.*, 144 Ga. App. 519, 520 (241 SE2d 627). "It is a universal rule that, where the insurer, by its acts in negotiating for a settlement, has led the policyholder to believe that he will be paid without suit, the insurer cannot take advantage of a provision in the policy which requires the action to be brought in a certain time. Cooley's Briefs on Insurance 3992." *Nee v. State Farm &c. Co.*, 142 Ga. App. 744, 746 (236 SE2d 880); see also *Stanley v. Sterling Mut. Life Ins. Co.*, 12 Ga. App. 475, 477 (77 SE 664); *Travelers Fire Ins. Co. v. Robertson*, 103 Ga. App. 816 (120 SE2d 657). "[A] waiver may result where the company leads the insured by its actions to rely on its promise to pay, express or implied." *Ga. Farm Bureau &c. Ins. Co. v. Mikell*, 126 Ga. App. 640, 642 (191 SE2d 557).

This incident occurred on December 6, 1980. On May 22, 1981, James Feltham, President of F. R. P., acknowledged receipt of a check in purported payment of the loss sustained by the company and asked Commercial Union for the reason for their refusal to pay the actual costs incurred by F. R. P. In a reply letter, dated July 10, 1981, Willian VanDuzee, Regional Claims Manager, explained why the claim had not been paid in full and stated: "With respect to the loss of the product in process . . . The occurrence as reported to us by Risk Control is specifically excluded by the policy, and therefore we would have no coverage for the loss of product in process." The reason stated was that the ruptured safety disc allowed the product to be directed away from the reactor tank and the policy excluded from the definition of "accident," which was covered by the policy, the "functioning of any safety device or protecting device." However, Mr. VanDuzee concluded by saying: "I feel that perhaps the best way to bring this claim to a conclusion would be for me to meet with you at a convenient time to go over the remaining portion of the loss, and attempt to answer any question that you have in person."

Jack Hearon, Regional General Adjustor for Commercial Union, specialized in handling property insurance claims for his company. He testified: "We had taken a position and had made our position known to both the agent and the company. But in an effort to be reasonable when we deny a claim or deny part of a claim, particularly in an event like this when there is an absence of good factual information, we try to do what I call 'leaving the door open.' We said 'This is our position, but if you can show us some other information that indicates our position is wrong, we'll certainly reconsider it.' And as a result of some things that went on over a long period of time, there was finally a meeting, as I recall, January, '82, which resulted in a final letter, and as an accommodation, a very minor additional payment."

F. R. P. contended that Commercial Union did not understand the manufacturing process and this is why they claimed the loss of the product was due to the functioning of the rupture disc, because it permitted the mixture of chemicals to escape from the reactor tank. They argued that the loss of chemicals was caused by the failure of the reaction process which rendered the chemicals useless, and the cause of the failure of the mixing process was the "O" ring in the three-way valve. The "O" ring is a gasket and prevents air from going from one side of the "domotor" to the other — which raises or lowers the stem of the valve, and this controls the amount of flow of the methanol coolant to the reactor tank.

F. R. P. had an instrument engineer install the instrumentation of the plant when it was built. He was asked to investigate the cause of this incident. He spoke to the witnesses and the operator. He looked at all the instruments associated with this manufacturing process. He removed the instruments and checked them and the transmitters to insure they responded correctly. He checked the controllers to assure they worked properly and did a general "check-out and total evaluation" of the system. Finally he "pulled the control [three-way] valve . . . disassembled it, checked it out." He held up the old "O" ring and looked at it but did not see anything wrong with it. But, he explained, defects in the "O" ring are not always visible to the naked eye. It "could have a pinhole in it, nick, anything that would let air by . . ." He replaced the "O" ring, which is standard procedure, and reassembled the valve, installed it, and it worked fine. Since that time the entire system and the valve have worked. The only correction he made on the system was to change the "O" ring. He did not save the old "O" ring, but the insurance contract does not require the insured to present damaged or defective parts to the insurer.

Mr. Newsome, Vice President of the Insurance Agency which handled insurance for F. R. P., spoke to VanDuzee and told them they should "just sit down and see if we could come to a meeting of the minds as to settlement of the loss of this product. *They agreed to this*." (Emphasis supplied.) This was the basis for the January 1982 meeting between VanDuzee and Reeves for Commercial Union, and Newsome and Feltham, the President of F. R. P. Mr. Feltham testified that he was under the impression that they were negotiating with the company up and through their final meeting with VanDuzee and Reeves in January of 1982 — the 13th month following this incident. Newsome testified that as VanDuzee and Reeves left the meeting, they said: "We'll be in contact with you." When Newsome was questioned as to why he did not start suit before the 14-month period expired, he said the reason "is we could not get the company to tell us whether or not they were going to actually pay this loss or not." Following the January 1982 meeting the company made an additional

payment of $351.50 on April 15, 1982 and advised F. R. P. that the payment was not to be construed as a waiver or the right to assert the defense of a 14-month limitation for initiating suit against the company and "[o]ur meeting of 1-25-82 was not one of negotiation, but merely a hearing of your contentions."

Although OCGA § 33-24-40 provides that investigation of a loss or claim under an insurance policy, or engaging negotiations looking toward a possible settlement will not constitute a waiver of any policy provision, this court has held that whether or not the acts of the insurer lulled the insured into a belief that the limitation of action to bring suit on a policy was waived became a question of fact for the jury. *Nee v. State Farm Fire &c. Co.*, 142 Ga. App. 744, 747, supra; accord *Hartford Fire Ins. Co. v. Amos*, 98 Ga. 533 (2) (25 SE 575); *Laughinghouse v. First of Ga. Ins. Co.*, 123 Ga. App. 189 (2) (179 SE2d 675); *Ga. Farm Bureau &c. Ins. Co. v. Mikell*, 126 Ga. App. 640 (2), supra.

In the instant case the issue was submitted to the jury and it was decided in favor of the plaintiff. We find that the notification to F. R. P. of the denial of the claim for loss of product was not a final decision as the Regional Adjustor said he "left the door open" for additional evidence, particularly as to the "O" ring, and if they would come up with other evidence "we'll certainly reconsider it." The local adjustor for the insurer wrote and asked plaintiff to meet with him "to go over the remaining portion of the loss . . ." The local insurance agent for F. R. P. asked the insurer to sit down with them and "see if we can come to a meeting of the mind as to settlement of the loss for this [lost] product. They agreed to do this." The meeting was arranged and held in January of 1982 — in the 13th month following the loss. When the two representatives of the insurer left, one said: "We'll be in contact with you." This kept the "door" open into a reasonable time past the 13th month. We find that these facts are sufficient to submit the issue to the jury as to whether or not the insurer waived the time limitation. The jury found for the plaintiff and the evidence does not demand a verdict for the defendant. Hence, the trial court did not err in refusing to direct a verdict for the defendant and submitting the issue to the jury. *Reserve Ins. Co. v. Smith*, 145 Ga. App. 850, 852 (245 SE2d 66).

2. The trial court did not err in denying defendant's Motion for Directed Verdict based on the contention that the events of December 6, 1980, were not an "accident" within the language of the policy. Defendant argues that the loss of product occurred because of the functioning of the safety device and this was excluded from the definition of an "accident" covered by the policy. We agree with the plaintiff that the loss of the product was caused by the malfunction of the reaction procedure, and in particular the three-way valve which

was supposed to direct the coolant to the interior of the tank to control the temperature of the exothermic reaction caused by the mixture of the chemicals. The chemicals being mixed were rendered useless by the malfunction in the reaction process. The fact that they were vented to the outside of the tank through a safety device — the rupture disc, only prevented a greater loss which would have resulted from an explosion caused by the runaway exothermic reaction. The chemicals were already rendered useless at the time of the venting through the safety device. Their loss was caused by the malfunction of the cooling system and the fact that they were removed from the reaction tank via a safety device does not change the cause of their loss — an occurrence precipitated by the failure of the three-way valve.

3. We also find no merit to the remaining portion of defendant's Motion for Directed Verdict, that there was no evidence of a "sudden and accidental breakdown of the object . . . which manifests itself at the time of its occurrence by physical damage to the object . . . ." From defendant's argument at trial and in the brief we have concluded that the basis for this motion is that there was no physical evidence that there was a defective "O" ring and we have to assume something was wrong with it, and then we must assume that the defective "O" ring caused the runaway reaction. This type of reasoning, he posits, is a "classic situation of trying to erect one inference upon another." In support of his enumeration he cites *Miller v. Gerber Prods. Co.*, 207 Ga. 385 (62 SE2d 174) and *Ga. R. & Elec. Co. v. Harris*, 1 Ga. App. 714 (57 SE 1076). Both of these cases are wholly circumstantial evidence cases and in *Miller* the principal issue was application of the doctrine of res ipsa loquitur. Both cases are distinguishable from the instant case because the present case is not based entirely upon circumstantial evidence. However, we have no quarrel with the holdings of these cases, e.g., "before the jury could arrive at the ultimate fact by inference of the existence of other facts, the facts inferred must be reasonably and logically consequent upon *proven facts*. In other words, the jury cannot assume the ultimate fact merely from other facts which are based upon an inference rather than upon proof." 207 Ga. 388. In the case before us, it was a fact that there was a runaway exothermic reaction. It was a fact that there was a failure of the coolant system. It was a fact that there was a rise in the temperature of the chemicals in the reactor tank to where the recording graph showed it was so high it went off the sheet. It was a fact that the flow meter showed there was no flow of coolant going into the reactor tank. It was a fact that the entire system was checked and nothing was found to be wrong except that in the three-way valve, where defects in the "O" ring cannot be seen by the naked eye, the "O" ring was replaced and the system has worked perfectly since

its replacement. The inference arises from these facts that there was a defective "O" ring. The trial court did not err in refusing to grant a directed verdict on these facts and placing this issue before the jury.

4. Commercial Union enumerates as error the denial of its Motion for Directed Verdict as to Statutory Penalties and Attorney's Fees. The Supreme Court has held that "[s]uch judgment is not authorized if an insurer had reasonable and probable cause for making a defense to the claim." *Colonial Life &c. Ins. co. v. McClain,* 243 Ga. 263 (253 SE2d 745); accord *Ken-Mar Constr. Co. v. Bowen,* 245 Ga. 676 (266 SE2d 796). "Since there is evidence to support the award the only question is whether or not as a matter of law appellants had a reasonable defense." *Fuller v. Moister,* 248 Ga. 287, 288 (282 SE2d 889). The refusal to pay by the insurer dealt only with the claim for the loss of product. The product was lost, in one sense, by it being discharged from the reactor tank through the safety relief valve which functioned as it was supposed to do. The insurance policy had an exclusion for any claim which resulted from the proper functioning of a safety device. Hence, there was a factual basis for the insurer's refusal to pay. Secondly, although we have held that the product was actually rendered useless by the malfunctioning reaction process, the President of the insured, Feltham, stated that he was of the opinion that the insurer did not pay because they did not understand the manufacturing process. A lack of understanding, or comprehension of a chemical process, cannot be equated to "bad faith."

Under the facts of the instant case we find that neither the statutory penalty nor attorney fees are authorized as a matter of law, for this court has consistently held that "[i]f there is any reasonable ground for contesting the claim there is no bad faith and it is error to award penalty and attorney's fees." *Home Indem. Co. v. Godley,* 122 Ga. App. 356, 363 (177 SE2d 105); accord *Boston &c. Ins. Co. v. Warr,* 127 Ga. App. 364, 365 (193 SE2d 624); *Progressive &c. Ins. Co. v. West,* 135 Ga. App. 1 (1) (217 SE2d 310).

5. Defendant's exceptions to the charge related primarily to those issues resolved above in its Motion for Directed Verdict and there is no necessity to address them again as our holding hereinbefore is dispositive of them.

The judgment is affirmed on condition that the bad faith penalty and attorney fees will be written off. Otherwise, the judgment is reversed.

*Judgment affirmed on condition. Birdsong and Carley, JJ., concur.*

DECIDED SEPTEMBER 25, 1984.

*J. Edwin Peavy, Sam F. Lowe, Jr.,* for appellant.

*Ken W. Smith, J. Alexander Johnson*, for appellee.