**EXECUTIVE RISK INDEMNITY, INC., Plaintiff,**

v.

**AFC ENTERPRISES, INC., et al., Defendants.**

**Civil Action No. 1:04–CV–2523–CAP.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 26, 2007.

Cathy A. Simon, Charles A. Jones, Elizabeth Sarah Gere, Erik M. Pritchard, Kelly V. Overman, Wallace A. Christensen, Ross Dixon & Bell, Washington, DC, David Marlow Atkinson, Lisa Nicole Collins, Magill & Atkinson, Atlanta, GA, for Plaintiff.

C. Nelson Gill, George W. Walker, III, Richard H. Gill, Copeland Franco Screws & Gill, Montgomery, AL, C. Neal Pope, Teresa Pike Tomlinson, Alan G. Snipes, David Cowan Rayfield, Pope McGlamry Kilpatrick, Morrison & Norwood, LLP, Columbus, GA, for Defendants.

### ORDER

CHARLES A. PANNELL JR., District Judge.

This matter is now before the court for decision after a bench trial which concluded on April 30, 2007. Also before the court is plaintiff Executive Risk Indemnity Inc.'s motion for leave to amend its complaint [Doc. No. 302] to assert a claim predicated upon mutual mistake. The court hereby enters the following memorandum opinion and order addressing Executive Risk's motion for leave to amend and granting final judgment in this case. This order constitutes the court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

### Introduction

This litigation centers on the events leading up to Executive Risk's renewal of AFC's directors and officers ("D & O")

insurance policy for the 2003–2004 policy period (the "Policy"), and AFC's announcement on March 24, 2003, that it would be forced to restate its earnings for 2001 and for the first three quarters of 2002. At issue is whether AFC procured the Policy through "misrepresentations, omissions, concealment of facts [or] incorrect statements" either in its written application for the Policy, or in oral or written negotiations for the Policy.

Executive Risk asserts that AFC failed to provide truthful and accurate answers to two questions posed by its underwriters during the renewal process. Specifically, Executive Risk asked AFC whether its recent change in auditors had resulted in any significant changes in accounting practices. Executive Risk also asked AFC to discuss its relationship with the new auditor. As set forth in greater detail below, AFC did not disclose any changes in accounting practices to Executive Risk, and told Executive Risk that the relationship between AFC and its new auditor was "fine."

Executive Risk also asserts that AFC made material misrepresentations in its application for the Policy by submitting financial statements that materially misstated the financial condition of AFC. In addition, Executive Risk contends that AFC's President, Frank Belatti—who signed the application—had a duty to advise Executive Risk that, prior to the inception date of the Policy, he believed that AFC's 2002 financial statements would have to be restated.

AFC has asserted a counterclaim for breach of contract and seeks recovery of the full proceeds of the Policy along with interest and costs. AFC has further asserted a counterclaim pursuant to O.C.G.A. § 33-4-6 seeking a statutory bad faith penalty in the amount of $10,000,000. The parties have stipulated, and the court finds, that it has jurisdiction pursuant to 28 U.S.C. § 1332 over all claims and counterclaims at issue.

While the parties have asserted competing claims and counterclaims, all of the claims are largely interrelated. Executive Risk seeks a declaratory judgment that it properly rescinded the Policy, and the defendants contend Executive Risk breached the Policy because it rescinded the Policy and refused to pay without any reasonable basis. In the absence of Executive Risk proving by a preponderance of the evidence its entitlement to rescind, AFC would be entitled to judgment on its counterclaim for breach of contract in the amount of $20,000,000, plus interest and costs. If Executive Risk's failure to pay AFC's loss was in bad faith, O.C.G.A. § 33-4-6 provides a statutory penalty of $10,000,000, as this amount is equal to fifty percent (50%) of the covered loss sustained by AFC. The court must therefore decide two central questions: (1) whether, in trial, Executive Risk satisfied its burden of establishing that AFC improperly procured renewal of the Policy; and (2) whether Executive Risk's failure to indemnify AFC was in bad faith. As set forth herein, the court concludes that Executive Risk's rescission of the Policy was improper, and that AFC is entitled to recover the full proceeds of the Policy pursuant to O.C.G.A. § 33-4-6.

## FACTUAL BACKGROUND

### 1. The Parties

Executive Risk is a Delaware corporation with a principal place of business in New Jersey. Executive Risk is a liability insurer that issues, among other lines of coverage, directors and officers liability insurance coverage. AFC is a Minnesota corporation which maintains its principal place of business in Georgia. AFC operates, develops, and franchises quick-service restaurants under the name Popeyes

Chicken and Biscuits. It previously owned and operated Church's Chicken, Torrefazione Italia Coffee, Seattle's Best Coffee, and Cinnabon. The other defendants in this matter are, or were, directors or officers of AFC.

### 2. *AFC Changes Auditors*

Historically, AFC's financial statements were audited by the Arthur Andersen firm. However, when that firm was indicted in connection with the Enron scandal, AFC was forced to change auditors. After hearing presentations from a number of the major accounting firms, AFC elected to retain KPMG as its new outside auditor in early 2002. Among other reasons, AFC chose KPMG because it had significant experience in the quick-service restaurant industry and audited a majority of AFC's peer group. The dynamic of AFC's relationship with KPMG differed from its prior relationship with Arthur Anderson. Arthur Anderson had acted both as an auditor and a consultant—in other words, it would actively advise AFC to use particular accounting methods to the company's advantage. In contrast, KPMG's corporate policy was to act strictly in an auditing capacity. Thus, it would not advise AFC to use one method over another; instead, if AFC utilized a particular accounting method that seemed to differ from the majority practice, KPMG would seek an explanation from AFC as to its reasoning and then decide whether to sign off on the numbers reached using the method.

### 3. *Underwriting for the Renewal of AFC's Directors and Officers Insurance Policy*

AFC had at least a ten-year history of procuring various types of executive protection policies from Executive Risk (which was subsequently acquired by the Chubb Group of Insurance Companies), including fiduciary, crime, kidnap and ransom, em-

ployment practices, and directors and officers liability. AFC had carried D & O coverage since 1999 and had renewed its policy annually. Each of the policies within the executive protection umbrella had different renewal dates that were a function of when the particular policy had been purchased and when the existing policy was expiring. Prior to the events giving rise to this lawsuit, AFC had not suffered any losses or made any claims on any of the policies it maintained for over ten years with Executive Risk and/or Chubb.

The D & O policy had a policy period that ran annually from March 2nd to March 2nd. The renewal process typically began 60–90 days in advance of the expiring date of the previous policy. In keeping with this practice, the process of renewing AFC's 2003 D & O insurance coverage began in approximately late December, 2002, or early January, 2003. The underwriters for Executive Risk (technically, Chubb) who had handled AFC's prior D & O renewal in 2002 had left the company, and two new underwriters, Paul O'Donnell and his supervisor Andrew Menger, were assigned the AFC account, although only Mr. Menger had any authority to underwrite, quote, or issue the policy.

As part of the D & O renewal process, the Executive Risk underwriters requested a meeting with AFC, just as Executive Risk had done every year when AFC's D & O policy came up for renewal. Ted Twombly, an insurance broker, was the liaison between the underwriters and AFC. A meeting with the Chubb underwriters, Mr. Twombly, and AFC representatives was scheduled at AFC's office in Atlanta for January 24, 2003. Some days prior to the meeting, the underwriters circulated ten written questions which represented the areas of inquiry that were to be

discussed at the meeting. These questions were supplied to AFC by Mr. Twombly.

The meeting was attended by Gerald Wilkins, then Chief Financial Officer of AFC, several other representatives of AFC, Mr. Twombly, and the two underwriters. Either Mr. Menger or Mr. O'Donnell (their testimony was in conflict on the issue) asked the questions from the list of ten questions provided to AFC, and Mr. Wilkins responded. None of the questions asked at the January 24, 2003, meeting inquired as to whether AFC was considering a restatement of its earnings. Among the questions, however, was Question 9, which asked the following: "Have there been any significant changes in accounting practices? Please discuss AFC's relationship with its new auditor?"

There are some minor inconsistencies in the evidence regarding exactly what Mr. Wilkins said in responding to Question 9. Mr. Menger testified that he recalled Mr. Wilkins saying "KPMG is reviewing policies and procedures, everything is fine, something to that effect." (Tr., p. 658.) Mr. O'Donnell similarly testified that Mr. Wilkins responded "everything is fine and they [KPMG] are just double-checking policies and procedures." (Tr., p. 488.) Mr. Menger's contemporaneous notes from the meeting say "KPMG auditors assessing and documenting internal controls." (Jt.Ex.20.) Mr. Twombly's contemporaneous notes say "KPMG new auditors—Sect 404—doc. int. controls." (Jt.Ex.26.)

After the meeting ended, Mr. Twombly told Executive Risk's underwriters that AFC wanted to re-allocate portions of its "tower" of directors and officers coverage—a group of policies provided by several different insurers. Twombley accordingly asked whether Executive Risk would be interested in increasing its limit from $5 million to $10 million. This increase in coverage from Executive Risk was to take the place of a portion of the coverage tower formerly provided by another insurance company and did not result in an overall increase in coverage for AFC.

The only other contact between anyone at Executive Risk and anyone at AFC during the underwriting process was through an insurance application (the "Application") Executive Risk required AFC to complete. On February 20, 2003, Mr. Frank Belatti (AFC's Chief Executive Officer at the time), signed the Application. In the Application, Executive Risk inquired as to whether AFC had changed auditors in the past three years. It has been stipulated that Mr. Belatti truthfully answered "yes," and attached Insert B to the Application disclosing the reasons for the change in auditors. In signing the Application, Mr. Belatti, on behalf of AFC, declared that the statements in the Application, including the financial statements, were true to the best of his knowledge and belief.

At trial AFC presented an argument that, because the words "See Attachments" is typed on the Application, only the latest audited annual report should be deemed part of the Application. However, as the court found in its ruling on the parties' cross-motions for summary judgment [Doc. No. 260], the Application included certain publicly-filed documents, including AFC's "latest 10–K, 10–Q, 8–K and 13d reports filed with the SEC," as well as its "latest proxy statement." This is consistent with Twombley's testimony as AFC's broker that the "requested information" is supposed to be attached. (Tr., p. 458.)

The Application states that AFC has a continuing duty to notify Executive Risk if there is "any material change in the answers to the questions [on the Application] prior to the policy inception date." This duty ran through March 1, 2003—the day before the inception date of the Policy.

### 4. *Issuance of the D & O Policy*·

On February 28, 2003, Executive Risk confirmed that it was binding coverage for AFC and other insured persons on Directors and Officers Liability Insurance Policy Number 8168–0180. The binder letter written by Mr. O'Donnell confirmed that Executive Risk was providing coverage for the policy period beginning at 12:01 a.m., March 2, 2003 to March 2, 2004. The aggregate limits of liability stated in the binder were $10,000,000 for claims under Insuring Agreements (A), (B)(1), and (B)(2), and $10,000,000 for claims under Insuring Agreement (B)(3).[1] The premium quoted for the entire coverage was $440,300, and was due 45 days from the end of the month in which the premium was effective. The premium was timely paid by AFC and received by Executive Risk on May 8, 2003. On March 11, 2003, Executive Risk delivered the Policy to AFC's independent insurance broker, which then forwarded the Policy to AFC. The declarations page of the Policy identified the same limits of coverage as those stated in the binder letter. The Policy is a claims made indemnity policy that includes Defense Expenses (defined in the Policy to include attorneys' fees and expenses) in the limits of liability. The Insuring Agreements of the Policy provide the following coverages:

1. INSURING AGREEMENTS

 A. The Underwriter [Executive Risk] will pay on behalf of the Insured Persons Loss from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, except for Loss which the Company pays to or on behalf of the Insured Persons as indemnification.

 B. The Underwriter [Executive Risk] will pay on behalf of the Company [AFC]:

 (1) Loss from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts which the Company pays to or on behalf of the Insured Persons as indemnification; and

 (2) Loss from Securities Claims first made during the Policy Period against the Company; and

 (3) (OPTIONAL COVERAGE) if it is stated in the Declarations that coverage is provided under this INSURING AGREEMENT (B)(3), Loss from Securities Claims first made during the Policy Period against the Offering Underwriter which the Company pays to or on behalf of the Offering Underwriter as indemnification pursuant to the terms and conditions of an Underwriting Agreement.

(Pl. Tr. Ex. "62", Policy, ¶ I.)

Executive Risk has stipulated that "[s]ubject to its other terms and conditions, the Policy provides AFC and its directors and officers with $10 million in coverage for covered claims, inclusive of Defense Expenses, and $10 million in coverage for covered claims against Offering Underwriters, inclusive of Defense Expenses." By virtue of the dual limits of liability, the Policy provided a maximum of $20,000,000 in aggregate limits of liability if claims were made against AFC, current and former officers and directors of AFC,

---

1. On the third day of trial, Executive Risk for the first time contended that the $10,000,000 in (B)(3) coverage (for AFC's offering underwriters) was mistakenly issued. Executive Risk stipulated in the pretrial order that the Policy provided a total of $20,000,000 in coverage. After the trial, Executive Risk moved to amend its Complaint to assert an alleged "mutual mistake." The court addresses that motion herein.

and AFC's offering underwriters on AFC's initial or secondary public offerings of stock.

### 5. AFC's Decision to Restate Its Financial Statements

At the same time as AFC was renewing its D & O insurance, it was also going through its routine year-end audit. The audit process occurred in late 2002 and early 2003 to enable AFC to close its books for the year 2002 in order to provide the final numbers and analysis to the auditors. AFC's audit initially proceeded in a customary manner, and the chairperson of AFC's Audit Committee, Ms. Carolyn Byrd, believed that the audit would be completed in time for AFC to file accurately and timely financial statements with the Securities and Exchange Commission ("SEC"). Because AFC had recently been late filing its financial statements with the SEC, it was very important for the Audit Committee and AFC management that the financial statements be filed on time. Indeed, the consequences of another late filing could result in the company being delisted by NASDAQ—a catastrophic occurrence for a public company.

As the audit proceeded, numerous accounting issues arose that caused concern within AFC that the financial statements might not be completed in time. Of the many issues that were closely examined, four would ultimately be involved in the company's restatement of earnings that gave rise to this lawsuit. Those issues were as follows: (1) the method used by AFC to account for the impairment of long-lived assets (also referred to as the FAS–144 analysis); (2) the method by which AFC accounted for fees paid—or discounts provided—to retailers in order to obtain marketing preferences (also referred to as "slotting fees"); (3) the

method used by AFC to account for post-employment payments to a former AFC executive (also referred to as the Frankel consulting agreement); and (4) AFC's use of off balance sheet accounting for cooperative advertising funds. Among these issues, the FAS–144 analysis was by far the most significant in terms of dollar value. Had a change in AFC's FAS–144 analysis methodology not been necessary, the financial impact of the other accounting issues alone would probably not have been significant enough for a company of AFC's size to require a restatement of earnings.

The FAS–144 analysis involved the determination of whether to record a charge as a result of losses being incurred at any of AFC's retail outlets (an impairment of any "long-lived assets to be held for use"). Prior to hiring KPMG to be its outside auditor, AFC had evaluated such impairments by aggregating all of its retail outlets within a market (a "market-based" approach). Although this appears to have been the minority approach in the industry, in was nonetheless an accepted accounting principle and was used by several other national quick-service restaurant chains.

In late 2001, however, the Financial Accounting Standards Board ("FASB"), the organization that establishes standards governing the preparation of financial reports in the private sector, had issued Statement of Financial Accounting Standards No. 144 ("FAS–144"), entitled "Accounting for the Impairment or Disposal of Long–Lived Assets." FAS–144 clarified an early FASB pronouncement by requiring that long-lived assets be grouped together "at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities." (Pl. Tr. Ex. 135, Ex. H.)[2] Thus, if

---

**2.** Pl. Tr. Ex. 135 is a letter submitted to the SEC by AFC. Exhibit H includes AFC's De-

cember 2002 "Statement of Position Re: Im-

AFC's individual stores had "identifiable cash flows largely independent of the cash flows" of other stores, FAS–144 virtually required it to measure impairment on a "site" (individual unit) basis, rather than on a "market" (grouping of stores) basis. Gerald Wilkins, AFC's CFO, strongly disagreed with applying the FAS–144 approach and continued to believe through the time of trial that the market-based approach was more appropriate for the company.

Because of the change in auditors and the new FASB pronouncement, the FAS–144 analysis issue was an area of concern throughout the 2002 year-end audit. The minutes of the December 19, 2002 Audit Committee meeting illustrate this:

> Mr. Wilson [AFC's Chief Accounting Officer] . . . explained new FAS 144, which suggests that impaired tangible assets should be reviewed at the unit level rather than within a general area. He further explained that the Company, with the concurrence of its previous auditor, had historically performed its impairment analysis based on a general market area; however, KPMG has indicated that their experience would suggest that the analysis be conducted at the individual unit level.

(Jt. Tr. Ex. 5.) Gerald Wilkins disagreed with Wilson's preliminary analysis of the issue and preferred to convince KPMG to accept AFC's use of a market-based analysis. In order to be prepared for a potential shift to a unit-based analysis, if necessary, Wilson and others in the accounting department began to prepare estimates of net income reductions for the various divisions of the company using the FAS–144 unit-based analysis. The progress of these and other accounting analyses were tracked in documents called "Year–End Issues Logs." None of these documents indicates that AFC management had yet reached a final decision on the FAS–144 analysis.

AFC's Audit Committee held a special meeting, attended by Mr. Wilkins, Mr. Wilson, Ms. Jesup, Mr. Tanenbaum, Mr. Reid, and others, on the afternoon of Friday, February 28, 2003. At the meeting, Mr. Wilson discussed in detail the "methodology relating to impairment of long-lived assets, ad fund consolidation . . . as well as certain other 2002 items and their cut-off relating to 2001." (Pl. Tr. Ex. 58.) The minutes reflect that members of the Audit Committee questioned Mr. Wilson and Mr. Reid, KPMG's senior audit partner, about the implications of these issues on the "current year as well as prior years." At the same meeting, AFC's General Counsel advised the Audit Committee of AFC's deadline for filing its 10–K with the SEC and the implications for failure to file timely. The minutes of the February 28 meeting show that while the issues—including FAS–144 analysis—that were delaying completion of the audit were a pressing concern, no decision was reached on the resolution of those issues at the meeting.

The next day, Saturday, March 1, 2003, a group of AFC officers met to discuss the status of completion of the audit. By that time, KPMG had requested documentation regarding AFC's existing methodology for FAS–144 analysis. KPMG's apparent reluctance to accept a market-based analysis was in direct conflict with Wilkins' firm position that AFC should continue to employ a market-based analysis, putting timely completion of financial statements seriously in question. The meeting was attended by Mr. Wilkins, Mr. Wilson, Paul Marsden (an accounting employee supervised by Mr. Wilson), and Gary Pell. Mr.

---

pairment of Long–Lived Assets" which sets forth the Company's understanding of the re-

quirements of FAS 121 [the earlier FASB pronouncement on the issue] and FAS 144.

Pell, who was a friend of Allan Tanenbaum (AFC's General Counsel at the time), was a partner at another accounting firm, PricewaterhouseCoopers, and had been invited to the meeting by Mr. Tanenbaum to help AFC discuss the issues in the audit. Mr. Tanenbaum had called Mr. Pell the night before and told him that "the relationship with KPMG was about at a breaking point ..." (Tr., p. 182.) AFC personnel were confused and frustrated at KPMG's position on market-based impairment analysis, given that Andersen had always approved AFC's use of the approach. As an experienced auditor, Mr. Pell explained that KPMG would not tell AFC how to conduct its impairment analysis, and instead AFC "needed to make the decisions, take them to KPMG, and then KPMG would either agree or disagree." (Tr., p. 199.) Mr. Pell explained that, given the approaching deadline for the filing of AFC's financial statements, the timing of these decisions was critical because KPMG would need time to audit the items prior to the deadline, and some of the items might need to be reviewed by KPMG's national office in New York.

Because of the pressing time concerns, one option discussed at the meeting was the possibility of switching to the site-based approach for calculating the impairment of long-lived assets. Mr. Wilson believed this would expedite completion of the audit and ensure that AFC's financial statements were timely filed. In the context of this discussion, the subject of a possible restatement of AFC's financial statements for 2001 and the first three quarters of 2002 was first discussed, because a restatement might be necessary to ensure a consistent presentation of earnings if a new methodology was adopted.

Later on March 1, 2003, Mr. Pell and Mr. Wilkins met with Mr. Belatti and Mr. Tanenbaum to report on the earlier meeting. During this meeting, the topic of a possible restatement was raised with Mr. Belatti, but no decision was made at that time, and all of the remaining audit items remained open after the meeting. None of the officers present at the March 1, 2003, meeting had the authority to decide whether to pursue a re-audit and possible restatement, as any such decision was required to be approved by AFC's Audit Committee, and then recommended to and approved by AFC's Board of Directors.

On March 3, 2003, Mr. Wilkins recommended to AFC's Audit Committee that AFC re-audit and, if necessary, restate its financial statements for 2001 and the first three quarters of 2002. The Audit Committee agreed with his recommendation, subject to approval by AFC's Board of Directors. AFC's Board of Directors met and approved the Audit Committee's recommendation on March 10, 2003. AFC's decision to re-audit its financial statements and, if necessary, to restate its financial statements was made on March 10, 2003, after coverage under the Policy had been bound and after the policy period had begun. There is no evidence that the dates of coverage for the D & O policy were a consideration for anyone at AFC when these decisions were being made.

### 6. The Underlying Actions And Executive Risk's Denial of Coverage

On March 24, 2003, AFC publicly announced that it would commence the work to restate its financial statements for 2001 and the first three quarters of 2002. Almost immediately after the decision to commence the restatement process was announced to the investing public, a number of securities class action lawsuits and shareholders' derivative lawsuits (the "Underlying Actions") were filed in various courts. The Underlying Actions asserted claims against AFC, current and former officers and directors of AFC, and the

offering underwriters of AFC's initial and secondary public offerings, Goldman Sachs, Credit Suisse, and Deutsche Bank.

The Underlying Actions were all filed during the term of the Policy. AFC (insured as the "Company" under the Policy), current and former officers and directors of AFC (insured as "Insured Persons" under the Policy), and Goldman Sachs, Credit Suisse, and Deutsche Bank (insured as the "Offering Underwriters" under the Policy) were all sued in one or more of the Underlying Actions. The allegations in the Underlying Actions triggered the full $20,000,000 limits of liability under the Policy because Claims and/or Securities Claims were asserted against the Company, Insured Persons, and the Offering Underwriters, as defined in the Policy. AFC provided Executive Risk with timely notice of each of the Underlying Actions.

Upon being notified of the Underlying Actions, Mr. Hugh Spears (Executive Risk's claims adjuster, whose title was "Claims Counsel") did not accept coverage for the claims but instead concluded—based on the timing of the restatement in relation to the renewal—that the Policy was likely procured by fraud and was therefore subject to rescission. Mr. Spears then began an investigation into whether Executive Risk could rescind the Policy. The focus of the investigation was whether AFC had knowledge of an impending restatement at the time of the January 24, 2003 meeting, because, in Mr. Spears' mind, "it was suspicious to me that a restatement was announced right after the policy was renewed and right after the limits were increased." (Tr., p. 1005.) Mr. Spears acknowledged, however, that on the very first day he received notice of the Underlying Actions, he knew that AFC had not increased its overall tower of D & O insurance, and that AFC had merely announced its decision to commence the process of restating its earnings.

Executive Risk's investigation proceeded for seventeen months, during which AFC's cooperation with its requests for documents and interviews was half-hearted, at best. On August 24, 2004, approximately six months after the policy period expired, Executive Risk notified AFC that it had rescinded the Policy and then filed the present action for declaratory relief. Executive Risk, for the first time, tendered back the premium paid in May, 2003. AFC did not accept the tender and returned the premium check to Executive Risk.

### 7. *AFC's Alleged Damages*

Because Executive Risk refused to provide coverage to the defendants with respect to the Underlying Actions, the defendants were forced to defend the actions themselves without any reimbursement. AFC had indemnity agreements with its current and former officers and directors. Further, AFC had contractual indemnity agreements with its Offering Underwriters on its initial and secondary public offerings: Goldman Sachs, Credit Suisse, and Deutsche Bank. Pursuant to those indemnity agreements and the requirements of law, AFC paid all the attorneys' fees and expenses on behalf of itself, its current and former officers and directors, and the Offering Underwriters.

On June 15, 2005, AFC entered into a settlement agreement with the plaintiffs in the consolidated *In re AFC Enterprises, Inc. Securities Litigation,* No. 1:03–CV–0817–TWT ("*AFC Securities Litigation* "), which provided for a full and final settlement of all securities claims against AFC, its current and former officers and directors, and the Offering Underwriters. On July 1, 2005, AFC entered into a settlement agreement with the derivative plaintiffs in the consolidated *In re AFC Enterprises, Inc. Derivative Litigation,* No.

1:03–CV–1584–TWT ("*AFC Derivative Litigation*"), which provided for a full and final settlement of all pending shareholders' derivative claims. The settlements in the *AFC Securities Litigation* and the *AFC Derivative Litigation* were given final approval by Judge Thomas W. Thrash, another judge of this court. AFC, its current and former officers and directors, and the Offering Underwriters all received full releases from liability in the settlement agreements in the Underlying Actions.

AFC has to date expended a total of $25,507,464 in settlement costs, attorneys' fees, and expenses related to the Underlying Actions. Additionally, the settlements contained contingent obligations of up to $6,000,000 to be triggered in the event that AFC prevails in the instant lawsuit. Because the total damages sustained by AFC far exceed the limits of liability of the Policy ($20,000,000), AFC seeks recovery in this case of the full limits of the Policy, plus prejudgment interest, post-judgment interest, costs, and bad faith penalties pursuant to O.C.G.A. § 33–4–6.

### Legal Analysis

#### 1. *Executive Risk Has Not Established Any Basis For Leave to Amend*

After the conclusion of the trial, Executive Risk filed a motion for leave to amend its complaint to conform to the evidence at trial [Doc. No. 302]. In its motion, Executive Risk requests that the court allow it to amend its complaint to add a count seeking reformation of the rescinded Policy based on mutual mistake. In summary, Executive Risk contends that $10,000,000 of the

$20,000,000 in insurance coverage that was issued to the defendants in 2003 was issued by mistake. The mistake issue urged by Executive Risk was not raised until the third day of trial, and, because it did not relate to any issue in Executive Risk's pleadings or to any issue set forth in the pretrial order, the defendants timely objected to any such evidence. At trial, the court conditionally allowed Executive Risk's evidence subject to the defendants' objections, but reserved ruling on whether to strike the evidence. The court does so now.[3]

 Executive Risk's motion is brought pursuant to Federal Rule of Civil Procedure 15(b), which, under certain circumstances, provides for the amendment of pleadings to conform to the evidence. Executive Risk's motion fails to acknowledge, however, that prior to the trial, the parties consented to entry of a pretrial order [Doc. No. 270].[4] In the pretrial order, the defendants clearly stated that AFC sought recovery of the full proceeds of the Policy ($20,000,000), plus bad faith penalties, interest, and costs. *Id.*, p. 9. Executive Risk never disagreed with the amount sought by AFC nor asserted it was a mistake. Executive Risk instead *stipulated* that, "[s]ubject to its terms and conditions, the Policy provides AFC and its directors and officers with $10 million in coverage for covered claims, inclusive of Defense Expenses, and $10 million in coverage for covered claims against Offering Underwriters, inclusive of Defense Expenses." (Stip.Facts, ¶ 18.)

---

3. Although the court finds that Executive Risk's evidence concerning the alleged mistake should be stricken, the court has considered the evidence and finds that Executive Risk has not established a mutual mistake under the strict requirements of Georgia law.

4. Pursuant to the court's instructions in its summary judgment order [Doc. No. 260], the

parties electronically filed a joint proposed pretrial order on April 5, 2007 [Doc. No. 270] and the court printed a hard copy of the document on that date. Although the court's signed approval of the pretrial order never appeared on the docket, the court and the parties relied on the pretrial order as if it had been signed.

As stipulated by the parties, the pretrial order identified the issues to be tried, and clearly set out the limited circumstances under which that Order could be amended:

> IT IS FURTHER ORDERED that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and *that it supersedes the pleadings which are hereby amended to conform hereto and that this pretrial order shall not be amended except by Order of the Court to prevent manifest injustice. Any attempt to reserve a right to amend to or add to any part of the pretrial order after the pretrial order has been filed shall be invalid and of no effect and shall not be binding upon any party or the court, unless specifically authorized in writing by separate order of the court.*

Pretrial Order [Doc. No. 270], p. 14 (emphasis added); *see also* Fed.R.Civ.P. 16(e) ("The order following a final pretrial conference shall be modified only to prevent manifest injustice.").

Executive Risk has barely mentioned the existence of the pretrial order in its briefing, nor has it offered any evidence of "manifest injustice." The evidence at trial plainly established that Executive Risk knew of the alleged mistake issue years ago, and, as part of its litigation strategy, intentionally chose not to raise it. The senior underwriter on the AFC account, Andrew Menger, testified that he learned of the mistake issue in 2003 or 2004. Executive Risk's junior underwriter, Mr. O'Donnell, testified that he learned of the issue in August 2005, despite the fact that Mr. Menger testified that Mr. O'Donnell had told him about the issue far earlier. Finally, Executive Risk's claims counsel, Mr. Spears, a lawyer who has directed this case on behalf of Executive Risk, admitted that he knew of the mistake issue over a year ago and consciously decided not to raise it:

> Q. And you made a conscious decision not to test the issue of whether there was a mistake.
>
> A. Well—
>
> Q. Made that decision, didn't you, Mr. Spears?
>
> A. *We made a decision not to raise— not to amend our pleadings, correct. We made a conscious decision not to do that, correct.*

(Tr., p. 1057) (emphasis added).[5]

The court finds that Executive Risk will not suffer manifest injustice from a litigation tactic it consciously chose. It is evident that Executive Risk knew exactly what litigation tactics it was pursuing and why it was pursuing them. After Messrs. O'Donnell, Menger, and Spears all had full knowledge of the mistake issue, Executive Risk filed ten briefs in this court alleging that AFC had "substantially increased its limits of liability." In other words, while allegedly believing that the increase in

---

**5.** Executive Risk's claim in its brief that it could not assert the mistake issue because it believed that the mistake was not mutual is without merit. Every mutual mistake starts out as a unilateral mistake. Then, when the mistake is asserted in the pleadings with particularity as required by Fed.R.Civ.P. 9(b), the opposing party can either admit that the mistake occurred, or can respond to the particularized allegations of mistake so the issue can be litigated. If Mr. O'Donnell's testimony is to be believed, he knew all of the elements now asserted to be a mutual mistake years ago. That is, he claimed: (1) that the underwriter coverage simply came as part of the Executive Risk computer program for executive protection policies, and he mistakenly failed to delete it; (2) that he, apparently, accidentally also wrote the coverage into his binder letter (and Mr. Menger also failed to observe the coverage); and (3) that he and Mr. Menger knew that there was no specific discussion of it in their meeting with AFC. If anyone truly believed there was a mistake, it could certainly have been pled, and then made an issue of discovery and proof.

AFC's limits was due to a "computer error," Executive Risk urged this court that AFC had "substantially increased its limits" as a motive to defraud Executive Risk. The court relied on these arguments as one basis for its ruling on the defendants' motion for summary judgment.[6]

Not once prior to the third day of trial was the court ever informed that Executive Risk actually believed AFC had, in fact, not "substantially increased its limits," but that Executive Risk planned to contend that the "substantial increase" was a "computer error." The defendants were likewise never placed on notice that Executive Risk intended to pursue a mutual mistake defense and, consequently, no discovery was conducted on the issue. Finally, because it was not raised in the pretrial order, the defendants and the court were not prepared to deal with the issue at trial. Neither the defendants nor the court could possibly have been aware that Executive Risk would contend that the Policy only provided $10,000,000 in coverage, especially since Executive Risk *stipulated* in the pretrial order that the Policy provided $20,000,000 in coverage. (Stip.Facts, ¶ 18.)[7]

Weighed against Executive Risk's conscious procedural posturing, the prejudice to the defendants and the orderly conduct of these proceedings caused by allowing an amendment at this late stage is far too great. In the exercise of its discretion, the court finds no evidence of manifest injustice justifying an amendment to the pre-

trial order. The court further finds that Executive Risk has not satisfied the requirements of Federal Rule of Civil Procedure 15(b), because the presentation of the mistake defense at this late juncture would unnecessarily prejudice the defendants in maintaining their counterclaims on the merits. *See, e.g., Morro v. City of Birmingham*, 117 F.3d 508, 515 (11th Cir. 1997) ("We have not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them."); *see also Hodges v. United States*, 597 F.2d 1014, 1017–18 (5th Cir. 1979) ("the courts have usually precluded an offer of proof of a new claim or defense where it is first presented at trial without prior mention of the claim or defense in either the pleadings or the pretrial order.").

■ While the court has determined that Executive Risk's motion for leave to amend is procedurally untimely and does not meet the requirements of Rule 15(b) or Rule 16, the court has nevertheless reviewed the evidence of mutual mistake presented by Executive Risk and finds that it falls considerably short of the "clear, unequivocal, and decisive evidence" required under Georgia law to support a mutual mistake defense. O.C.G.A. § 23–2–21(c); *see also Werner Enterprises, Inc. v. Markel American Insurance Co.*, 448 F.Supp.2d 1375, 1381–82 (N.D.Ga.2006) ("The Georgia Supreme Court has instructed that a court's power to reform a contract based upon a mistake, mutual or

---

6. *See* March 6, 2007, Summary Judgment Order [Doc. No. 260], p. 32 ("Simply from a circumstantial perspective, the timing of AFC's restatement announcement—three weeks after renewing and *substantially increasing the limits of its D & O policy*—is suggestive of misrepresentation on AFC's part.")(emphasis added).

7. In its brief, Executive Risk contends that the mistake issue was tried by "implied consent"

because the defendants allegedly "produced the evidence bearing on the issue." The record, however, shows that the defendants did not offer or produce any such evidence. The evidence on which Executive Risk relies in support of its mistake defense was all solicited by Executive Risk from witnesses it called in its case in chief. The defendants objected to any evidence concerning the mistake issue, and the court received Executive Risk's evidence subject to the defendants' objections.

unilateral, shall be exercised with caution, and to justify it the evidence shall be clear, unequivocal, and decisive as to the mistake."). Not only has Executive Risk failed to establish a mutual mistake, it has, in fact, admitted the contrary. In addition to its stipulation in the pretrial order, Executive Risk responded to the defendants' Requests for Admissions on March 7, 2006 (after Messrs. O'Donnell, Menger and Spears all knew of the alleged "computer error"), and admitted that the Policy had two separate $10,000,000 limits of liability, which combined for a total aggregate limit of $20,000,000. (Def. Tr. Ex. "101", Response Nos. 5, 6.) Under the Federal Rules, any matter admitted in response to a Request for Admission "is *conclusively established* unless the court on motion permits withdrawal or amendment of the admission." Fed.R.Civ.P. 36(b) (emphasis added); *Perez v. Miami–Dade County,* 297 F.3d 1255, 1264 (11th Cir.2002). Executive Risk has neither sought nor obtained a withdrawal of its admissions.

 Besides the fact that Executive Risk's mutual mistake arguments amount to arguing against a conclusive fact, the court finds the arguments unpersuasive. The only evidence of the alleged "computer error" relied on by Executive Risk is the testimony of its two underwriters, Mr. Menger and Mr. O'Donnell. These same witnesses have, however, admitted to having sworn falsely before the court in this case:

> Q. [By Mr. Gill]: All right. Now, let's look at paragraph 12, which is on page 5. Read that out loud please.
>
> A. [Mr. O'Donnell, reading from his Affidavit]: In addition to this meeting, Mr. Menger and I conducted telephone conferences and exchanged e-mails with Marsh and AFC throughout January and February of 2003. These communications, which were part of the underwriting process, focused primarily on accounting and financial issues.
>
> Q. *That is entirely false, is it not, based on your just immediately stated testimony?*
>
> A. Yes.

(Tr., p. 613–14) (emphasis added); *see also* Menger testimony, (Tr., p. 708) ("I can't say it was false, but right now it is not a hundred percent correct."); p. 711 ("I'm not saying it's a hundred percent true."); p. 735 (stating that a second affidavit was "[n]ot all false"). The court is not inclined to give credibility to the testimony of two witnesses who have admitted being less than candid with the court in the past.[8]

The evidence at trial failed to establish the "computer error" alleged by Mr. O'Donnell and Mr. Menger clearly, unequivocally, and decisively, as required by Georgia law. AFC's Risk Manager, Mr.

---

8. In its reply brief in support of its motion for leave to amend, Executive Risk argues that the false evidence was "not material" and that there were merely "minor discrepancies between the affidavit and O'Donnell's trial testimony." *See* Doc. No. 313, p. 12. The court disagrees. The false affidavit testimony of Mr. O'Donnell and Mr. Menger was right at the heart of Executive Risk's case. Their testimony that there were "numerous" telephone calls and e-mails during the renewal process was offered in an effort to convince the court that there were multiple opportunities when representatives of AFC could have misrepresented facts to Executive Risk. In fact, as Mr. Menger and Mr. O'Donnell admitted at trial, none of these telephone calls or e-mails occurred. But, in ruling on the defendants' motion for summary judgment, the court considered the testimony of Mr. Menger and Mr. O'Donnell in making the determination that there was a genuine issue for trial. *See* March 6, 2007, summary judgment order [Doc. No. 260], p. 5 ("On the basis of the information provided in the January 24, 2003, underwriting meeting *and during the underwriting process,* Executive Risk agreed to issue a renewal policy to AFC.") (Emphasis added); *see also id.,* pp. 29, 33.

Stawarz, testified that he wanted offering underwriter coverage as part of the D & O renewal. Mr. O'Donnell testified that he believed Executive Risk's computer system had a "drop down menu" and "when you type in the 10 million dollars on the coverage on D and O, at the time the system would automatically put 10 million dollars worth of coverage into all covered sections." (Tr., p. 514.) Mr. Menger explained that the "drop down" underwriter coverage was "part of the function of the policy," and, unlike the Federal Insurance form he was more accustomed to, underwriter coverage was "built in" to the Executive Risk form. (Tr., p. 669, 718.) Equally important, the computer generated premium notice to AFC included both the D & O coverage and the offering underwriter (IPO) coverage.

On February 28, 2003, Mr. O'Donnell affirmatively wrote a binder letter to AFC which, on its face, advised that Executive Risk was binding $10,000,000 in coverage for claims against the company and its officers and directors, and $10,000,000 in coverage for claims against the Offering Underwriters. The Policy was later issued to AFC and, again, stated on its face that AFC was receiving two separate $10,000,000 limits of liability. The binder and the Policy issued to AFC both provided D & O coverage and offering underwriter coverage, just as Mr. Stawarz wanted. AFC accepted the Policy and paid the premium charged for the Policy as set forth in the premium notice.[9]

■ It is difficult to accept, as Executive Risk urges, that a sophisticated insurance company like Executive Risk intentionally programmed its computer system so as to automatically issue $10,000,000 in coverage it never intended to issue. Nevertheless, there is at least some evidence that Executive Risk issued the coverage by mistake—notably, the fact that it charged AFC a premium for only $10 million in coverage. To the extent that Executive Risk acted by mistake, however, it was a unilateral mistake caused by Executive Risk's own negligence, such that reformation is not appropriate. O.C.G.A. § 23–2–29; *MAG Mutual Insurance Co. v. Gatewood*, 186 Ga.App. 169, 367 S.E.2d 63, 68 (1988) ("The 1984 insurance policy was written and closely reviewed by MAG Mutual's underwriting staff before it was signed and delivered to the defendant doctors, and the failure to discover any alleged uncertainties prior to delivery precludes any equitable reformation.").

In sum, the court finds that Executive Risk has established neither manifest injustice to itself, nor lack of prejudice to the defendants, sufficient to amend the pretrial order to assert the issue of mutual mistake. The court further finds that Executive Risk has not satisfied the requirements of Federal Rule of Civil Procedure 15(b) or Federal Rule of Civil Procedure 16 so as to justify an amendment of its pleadings. Finally, the court finds that regardless of the untimely nature of Exec-

---

9. In its reply brief in support of its motion for leave to amend, Executive Risk urges that the court should find a mutual mistake based on the "quote sheet" provided as part of the negotiations for the Policy. [Doc. No. 313, p. 15.] The "quote sheet" (Pl. Tr. Ex. "48") contained several different proposals for AFC's D & O coverage. Contrary to Executive Risk's contentions in its brief, it does not establish that Executive Risk "never quoted a premium for $20 million in policy limits." The "quote sheet" does not mention (B)(3)

coverage, which is entirely consistent with Mr. Menger's testimony that the (B)(3) coverage was "built into" the Policy. (Tr., p. 718.) In any event, in weighing the evidence, the court finds that the final premium bill delivered with the Policy which plainly states that "D & O IPO" coverage was being provided and charged for is far more credible evidence than a "quote sheet" provided during negotiations for the Policy. (Tr., pp. 717–18); *see also* (Pl. Tr. Ex. "62".)

utive Risk's motion, Executive Risk has failed to establish a mutual mistake on the merits. On its face, the Policy provides two separate $10,000,000 limits of liability, and the court, mindful of its obligation to construe the Policy broadly in favor of coverage for the insured, will enforce the Policy as written. *See North Metro Directories Publishing, LLC v. Cotton States Mutual Insurance Co.,* 279 Ga.App. 492, 631 S.E.2d 726, 729 (2006). Executive Risk's motion to amend to conform to the evidence [Doc. No. 302] is accordingly **DENIED,** and all evidence presented at trial concerning the issue of mistake is hereby **STRICKEN** in its entirety.

## 2. *Executive Risk Has Not Proven a Misrepresentation, Incorrect Statement, or Omission*

Having determined that the Policy provides $20,000,000 in total insurance coverage, the court now turns to the merits of the action. Executive Risk admits that the Policy was issued to AFC; that AFC paid the full premium due on the Policy for both D & O coverage and underwriter coverage; that covered claims were made against AFC, its current and former officers and directors, and AFC's offering underwriters during the term of the Policy; and that the claims were timely reported to Executive Risk during the term of the Policy. Executive Risk does not assert any defenses to coverage other than contending that the Policy is subject to rescission pursuant to O.C.G.A. § 33–24–7 or, alternatively, pursuant to Georgia common law governing fraudulent procurement of contracts.

■ As the party alleging fraud and the right to rescind in its own action, Executive Risk bears the burden of proving its affirmative defense to coverage. *Reserve Life Insurance Co. v. Ayers,* 217 Ga. 206, 121 S.E.2d 649, 654 (1961) ("This court has repeatedly held that the burden was upon

the insurer to prove an affirmative defense, such as fraud on the part of the insured in obtaining the policy, or that a loss apparently covered by the policy came within an exclusionary clause contained in the policy."). Under Georgia law, "[i]n order for misrepresentations to void coverage, such statements must be made for the purpose of procuring insurance not otherwise procurable, must be material to the acceptance of the risk, must be false and made with intent to defraud." *Insurance Co. of West v. Dills,* 145 Ga.App. 183, 243 S.E.2d 549, 552 (1978).

■ Executive Risk's burden of proof in this case is substantially impacted by the express terms of the Policy. As the court previously found in its summary judgment order [Doc. No. 260, p. 26], parties to an insurance contract can contractually limit the insurer's right to rescind. *United Insurance Co. of America v. Walton,* 127 Ga.App. 857, 195 S.E.2d 295 (1973). In this case, the parties have contractually limited the right to rescind in four material respects:

(1) The Policy provides that "[i]nformation submitted with the Application will be considered part of the Policy only if actually attached to the Policy when issued, and the definition of the term 'Application' and the Application itself will be deemed to have been amended accordingly." (Pl. Tr. Ex. "62", Policy, Endorsement 1, ¶ 1.)

(2) AFC, as the applicant for insurance, did not provide any warranties in connection with the answers to the questions on the Application, or anything submitted with the Application. (Pl. Tr. Ex. "62", Policy, Endorsement 1, ¶ 2)("No warranties, express or implied, will be deemed to have been made by or on behalf of any of the persons or entities entitled to coverage under this Policy as a result of any representations made with respect to any information in, or submitted with, the Ap-

plication."); *see also* (Def. Tr. Ex. "54", Application, ¶ 14) (noting that the warranty question was "N/A").

(3) Paragraph 16 of the Application provides that Frank Belatti, who signed the Application, only declared "that to the best of his or her knowledge and belief the statements set forth herein are true." (Def. Tr. Ex. "54".)

(4) Finally, Condition (J) of the Policy provides:

> The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any Insured will be imputed to any other insured except for material facts or information known to the person or persons who signed the Application. In the event that any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

(Pl. Tr. Ex. "62", Policy, Condition (J)).

As a result of Endorsement 1 to the Policy and paragraphs 14 and 16 of the Application, Mr. Belatti (as the signor of the Application) did not warrant any answers to the questions on the Application and did not warrant AFC's financial statements. Mr. Belatti only certified that the statements in AFC's answers to the questions on the Application were true "to the best of [his] knowledge and belief." Condition (J) of the Policy expressly states that the Policy can only be rescinded with respect to any insured who "knew of [an] untruth" in the Application. The only knowledge that can be imputed to insureds are "material facts or information known to the person or persons who signed the Application." [10]

The court has previously found that "[i]t does appear true that under the wording of the policy, Executive Risk generally cannot rescind coverage for insureds who did not possess knowledge of material misstatements on the application." [Doc. No. 260, p. 27.] Thus, although O.C.G.A. § 33–24–7 might generally allow an "incorrect statement" that is not necessarily fraudulent to serve as justification for rescission (*see* O.C.G.A. § 33–24–7(b)), Executive Risk's contract specifically requires *knowledge* as a prerequisite to rescission. Because of this requirement, there is no practical distinction between Executive Risk's claim pursuant to O.C.G.A. § 33–24–7 and its common law claim of fraudulent procurement. According to the plain terms of Condition (J) of the Policy, in order to rescind the Policy as to all insureds, Executive Risk bears the burden of proving either: (1) that every insured "knew of [an] untruth" in the Application; or (2) that Mr. Belatti knew of a material misstatement in the Application. With this background in place, the court analyzes the evidence offered by Executive Risk at trial.

## A. *The Application*

Because Condition (J) of the Policy conditions rescission on knowledge of an untruth "in the Application," the Application completed by Mr. Belatti is the logical

---

**10.** As the plain wording of the Application suggests, the requirement that Mr. Belatti attest to facts "to the best of [his] knowledge and belief" changes the inquiry from whether Mr. Belatti's answers were "objectively accurate" to whether they were "answered to the best of [the insured's] knowledge." *Hamilton v. Mecca, Inc.,* 930 F.Supp. 1540, 1550 (S.D.Ga.1996).

starting point and can be quickly dealt with. Executive Risk admitted at trial that Mr. Belatti's answers to the questions in the Application were not false or incorrect, and no evidence of any kind was offered to establish that Mr. Belatti knew of any false matter associated with the Application.

Executive Risk's contended, instead, that Mr. Belatti had knowledge that the company's financial statements, which were deemed to constitute part of the application, were incorrect. However, the evidence does not establish a misrepresentation or incorrect statement by Mr. Belatti. Because AFC was an existing insured, AFC was not required to complete section 13 of the Application, which called for a warranty of facts to Executive Risk. Thus, AFC did not warrant any facts to Executive Risk, and Mr. Belatti only stated that the statements in the Application were true "to the best of [his] knowledge and belief." (Def. Tr. Ex. "54"; Tr., pp. 561–62); *see also* (Pl. Tr. Ex. "62", Policy, Endorsement 1, ¶ 2) ("No warranties, express or implied, will be deemed to have been made by or on behalf of any of the persons or entities entitled to coverage under this Policy as a result of any representations made with respect to any information in, or submitted with, the Application.").

Executive Risk has not proven by a preponderance of the evidence that Mr. Belatti knew that AFC's prior financial statements were not true and correct on February 20, 2003, when he completed the Application. Mr. Belatti testified that he always believed the financials, which he certified to the SEC, and which were fully audited or reviewed by either Andersen (in the case of the 2001 10–K) and KPMG (with respect to the 10–Qs for the first three quarters of 2002), were true and correct. Mr. Belatti was not involved in the day-to-day process of AFC's audit, was not primarily responsible for dealing with KPMG, and relied on Mr. Wilkins to let him know about any significant issues involving the audit. Mr. Belatti was never informed that AFC's financial statements were not true and correct, and, as of February 20, 2003, he fully believed they were true and correct.

The evidence established that Mr. Belatti had very little knowledge about the technical audit issues being handled by Mr. Wilkins and Mr. Wilson until the meeting held on March 1, 2003, and that he never believed a restatement of AFC's earnings would be necessary. Mr. Belatti's belief is confirmed by other credible evidence. Ms. Carolyn Byrd (Chair of the Audit Committee of AFC's Board of Directors) testified that on the afternoon of February 28, 2003 (just a day prior to the March 1 meeting), she sought and received assurances from both the company (AFC) and the auditors (KPMG) that everything was being done to resolve the open audit issues. Likewise, Mr. Pell, an outsider and disinterested witness, also testified that based on everything he saw and heard at the March 1, 2003, meeting, his impression was that no one at AFC had considered a possible restatement prior to that time. There was no evidence presented at trial that anyone at AFC ever considered a restatement of AFC's earnings prior to the March 1, 2003 meeting.

Finally, although the subject of a possible restatement was first raised on March 1, 2003, no decision on a restatement was made at that time. Mr. Wilson testified that after the March 1, 2003, meeting, he requested Mr. Marsden to calculate the impact on AFC's prior financial statements of using a site-based methodology for AFC's impairment analysis. From a factual standpoint, no decision to restate could have been made because AFC did not know the impact of a change in meth-

odology. Moreover, the evidence at trial was clear that none of the AFC officers present at the March 1, 2003 meeting had the authority to decide to restate AFC's earnings. Ms. Byrd (Chair of the Audit Committee of AFC's Board of Directors) testified that the Audit Committee was required to approve the decision, and only did so on March 3, 2003, subject to approval by AFC's Board of Directors. Mr. William Ide (Chair of the Corporate Governance Committee of AFC's Board of Directors) testified that AFC's proposed restatement of earnings was not decided upon until AFC's Board of Directors met on March 10, 2003.

The court finds the testimony of these witnesses to be credible and consistent. As of February 20, 2003, Mr. Belatti, "to the best of [his] knowledge and belief," believed that all of the statements made in the Application were entirely true and correct, and believed that AFC's prior publicly-filed financial statements were entirely true and correct. Executive Risk has failed to prove by a preponderance of the evidence that Mr. Belatti made any false, misleading, or incorrect statement in connection with the completion of the Application.

### B. *The January 24, 2003, Meeting*

Other than the Application, the only other contact between Executive Risk and AFC during the underwriting of the Policy was a meeting held between Executive Risk's underwriters and certain AFC employees on January 24, 2003. The meeting was attended by Gerald Wilkins, then Chief Financial Officer of AFC, several other representatives of AFC, Mr. Twombly, and Executive Risk's two underwriters. At trial, Executive Risk contended that Mr. Wilkins made a material misrepresentation when he was asked Question 9 on a previously prepared list of questions: "Discuss your relationship with your new auditor. Have there been any significant changes in your accounting practices?" (Pl. Tr. Ex. "35".)

The evidence at trial established that Messrs. O'Donnell, Menger, and Twombly all took contemporaneous notes of the meeting and the responses to the questions. Mr. O'Donnell's notes make no reference whatsoever to Mr. Wilkins' response to Question 9. Both Mr. Twombly's and Mr. Menger's notes are very similar, and indicate that the only response from Mr. Wilkins was that KPMG was currently assessing and documenting AFC's internal controls.

The notes of Messrs. Twombly and Menger are entirely consistent with other testimony and evidence concerning the status of AFC's audit as of January 24, 2003. At that time, KPMG was in the very early stages of its first annual audit of AFC's financials, covering the calendar year 2002. The testimony of all of the witnesses established that the audit process requires that the company (AFC) close its books (here, following the end of the 2002 calendar year), do its intended computations and analysis, decide on how to account for the various items and transactions, prepare its financials, and then submit the completed financials to the auditor (KPMG) to audit. This is confirmed by the minutes of the meeting of AFC's Audit Committee on January 22, 2003 (just two days prior to the insurance renewal meeting), which indicate that KPMG had just identified the 2002 audit "areas of focus." (Jt. Tr. Ex. "6", 1/22/03 Audit Committee minutes.) A response of Mr. Wilkins to Question 9 that KPMG was assessing and documenting AFC's internal controls, as reflected in both Mr. Twombly's and Mr. Menger's notes, comports exactly with what would have been occurring in the course of a routine audit process (as shown by the testimony of Mr. Wilkins, Ms. Byrd,

Mr. Wilson and others) as of January 24, 2003.

Despite the fact that the handwritten notes of Messrs. Twombly, O'Donnell, and Menger do not recount any such conversation, Mr. O'Donnell testified at trial that he recalled that Mr. Wilkins, in response to Question 9, stated that the relationship with KPMG was "fine." (Tr., p. 582–83.) Even assuming the testimony of Mr. O' Donnell true, the court is not persuaded that any false representation or incorrect statement was made at the January 24, 2003, meeting. Ms. Byrd, who has extensive experience in the audit process with many large corporations including Coca–Cola, Reliastar Financial, and the St. Paul/Travelers Company, described the relationship between AFC and its auditor as "professional." (Tr., p. 786.) Mr. Wilson described the relationship as "professional in nature" and "[p]retty much like every other audit I had gone through working for other publicly-held companies." (Tr., p. 235.) Mr. Wilkins testified that the relationship was "good" and "professional." (Tr., p. 263.) There is no credible evidence to suggest that the relationship between AFC and KPMG was anything but "fine" on January 24, 2003.

Finally, the evidence fails to establish that AFC had made any "significant changes in accounting practices" as of January 24, 2003. As of that date, AFC was still in the process of closing its year-end books, and had not completed its analysis of many items, including the impairment analysis. The only thing that can be said regarding accounting items as of January 24, 2003, was that some of AFC's internal accountants were analyzing a new FASB pronouncement regarding long-lived assets, and there was an ongoing internal discussion between the accountants and Mr. Wilkins regarding its interpretation and application. Mr. Wilkins had no intent or expectancy of altering the compa-ny's historical method of reporting impairment of long-lived assets, a method which had been in place at the time of the company's first public offering of securities and at all times subsequent. Mr. Wilkins had participated in the implementation of the market-based approach in consultation with Andersen, and the method had been fully disclosed in AFC's previous financial statements and had been submitted to the SEC—which lodged no objection to the method.

Considering the evidence in its entirety and judging the credibility of the witnesses, the court finds that no misrepresentations, incorrect statements, or omissions were made by Mr. Wilkins or any of the AFC representatives at the January 24, 2003, meeting. As of that date, AFC had not changed any of its accounting practices. Although the question was not asked, any potential changes in accounting practices on the part of AFC were not even decided upon until March 10, 2003, at the earliest, and the changes were not made until AFC filed its restated financial statements on December 15, 2003. The mere fact that internal accountants were discussing accounting issues does not rise to the level of establishing a basis to rescind the Policy.

### 3. The Defendants Did Not Violate Any Duty to Update

Executive Risk finally contended at trial that even if the defendants did not initially make any misrepresentation, the defendants had a "duty to update" and allegedly violated that duty by failing to disclose that AFC had decided to restate its financial statements. Assuming that such a duty to update existed, that duty could be no broader than the contract of insurance. The Application provides that "[i]f there is any *material change in the answers to the questions* prior to the policy inception date

the Parent Organization [AFC] will notify the Company in writing and any outstanding quotation may be modified or withdrawn." (Def. Tr. Ex. "54", Application, ¶ 2.)

Executive Risk has admitted that none of AFC's answers to the questions in the Application were incorrect, much less false. Consequently, there was never any "material change in the answers to the questions" in the Application. Mr. Belatti's answers to the questions in the Application were true on February 20, 2003, and are still true to this day. The terms of the Application itself accordingly establish that AFC did not violate any "duty to update," and the court cannot broaden the terms Executive Risk chose to include in its Application. *See Cunningham v. Middle Georgia Mutual Insurance Co.*, 268 Ga. App. 181, 601 S.E.2d 382, 384 (2004) (an insurance policy is "construed against the insurer as the drafter of the policy and any exclusions from coverage are strictly construed"); *Lemieux v. Blue Cross & Blue Shield of Georgia*, 216 Ga.App. 230, 453 S.E.2d 749, 751 (1994) ("[a]n insurance policy is construed liberally to provide coverage").

Finally, to the extent that AFC's decision to commence the process to restate certain financial statements could be considered a "material change in the answers to the questions," despite the fact that no such question was asked, the court finds that any such change did not occur prior to the inception date of the Policy. As set forth above, the first discussion regarding a restatement of AFC's financial statements was not held by anyone at AFC until March 1, 2003, only hours before the Policy "incepted" at 12:01 a.m. the next morning. Mr. Ide, an attorney with substantial expertise in the area of corporate governance and a member of AFC's Board of Directors, testified that AFC's decision to restate its prior financial statements

was not made until the meeting of its Board of Directors on March 10, 2003. As of the "inception date" of 12:01 a.m. on March 2, 2003, no decision concerning a restatement of earnings had been made by AFC. Consequently, there was nothing for AFC to report. The court finds that the defendants did not violate any "duty to update."

### 4. *Executive Risk Has Not Proven a Material Misrepresentation*

In addition to the evidence at trial not establishing a misrepresentation by anyone at AFC, the evidence also failed to prove materiality. In order to support rescission, both O.C.G.A. § 33–24–7 and Georgia common law require that a misrepresentation be material to the risk, or, at a minimum, that the insurer establish that it "in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise." O.C.G.A. § 33–24–7(b)(3); *see also Dills*, 243 S.E.2d at 552 ("In order for misrepresentations to void the coverage, such statements ... must be material to the acceptance of the risk. . . ."). The evidence in this case established that the very facts that Executive Risk now claims were misrepresented were not material to the risk.

First, the evidence at trial was clear that Executive Risk never asked AFC whether it was planning to restate its earnings, either in the January 24, 2003, meeting or in the Application. Under Georgia law, "[a]n insurance company cannot assert that a factor is material to the risk about which it has neither made inqui-

ry [n]or apprised its prospective insured." *Georgia Farm Bureau Mutual Insurance Co. v. First Federal Savings & Loan Association*, 152 Ga.App. 16, 262 S.E.2d 147, 149 (1979); *see also Block v. Voyager Life Insurance Co.*, 251 Ga. 162, 303 S.E.2d 742, 745 (1983) ("We hold that the failure of the insured to supply information when no inquiry is made by the insurer or its agents and neither the certificate or master policy of insurance inform the insured that certain illnesses are not covered will not raise a defense of fraud or material misrepresentation in a suit on the policy."). If Executive Risk truly considered the prospect of a possible restatement of earnings to be material, it could have easily included a question in the Application inquiring about the subject, but chose not to do so.[11]

Second—and more importantly—even though its underwriters failed to ask about a possible restatement, the evidence established that Executive Risk's underwriters approved issuance of the Policy even after knowing full well of AFC's intent to restate its earnings, and knowing full well that securities claims had been filed against AFC. Mr. Menger, Executive Risk's chief underwriter on the AFC account, and the only underwriter having approval authority, testified:

Q. As of April the 1st, you had already participated in a conference call, six, seven days earlier about restatement, correct?

A. Yes.

Q. And you knew lawsuits had come in because they were filed within sixteen hours or so after the announcement, correct?

A. Yes.

(Tr., p. 721.)

Q. Whether it was internal or external, it didn't—You knew of the restatement and you didn't do anything other than approve the policy, correct?

A. Correct.

Q. You didn't tell anybody, I think I have been lied to, I'm terribly hurt, stop the presses. None of that occurred, did it, Mr. Menger?

A. Not in writing, no.

Q. Not orally. It didn't occur. You approved the policy, did you not?

A. I approved it.

(Tr., p. 722) (emphasis added).

Mr. Menger further testified that he did not have to approve issuance of the Policy; rather, he made the conscious decision to do so. His testimony established that Executive Risk knew of AFC's intent to restate, knew what caused AFC's proposed restatement, and knew that securities claims had been filed against AFC. Yet, on behalf of Executive Risk, Mr. Menger still approved issuance of the Policy.

Through its own conduct, Executive Risk has acknowledged that the very facts which it claims were not disclosed (i.e., that AFC had "accounting issues" or that AFC was allegedly planning to restate its earnings) were not material to the risk. In other words, Executive Risk did not rely on any alleged misrepresentation of AFC to its injury. *See, e.g., Taggart v. Claxton*, 170 Ga.App. 768, 318 S.E.2d 208, 210 (1984) (*quoting Bimbo Builders v. Stubbs Properties*, 158 Ga.App. 280, 279 S.E.2d 730, 731 (1981)) ("[i]t must be

---

**11.** The evidence at trial established that with respect to certain D & O policies, Executive Risk asks its insureds in the insurance application whether they know of any facts that might result in a restatement of earnings. No such effort was made in the underwriting process at issue here. As set forth above, however, even if Executive Risk had asked any such question in the Application, AFC would have truthfully answered "no" on February 20, 2003, when the Application was signed.

shown [that the party alleging the fraud] exercised due care to discover the fraud and that he relied upon the false representations to his injury."). The court finds that Executive Risk has not proven any material misrepresentation sufficient to satisfy O.C.G.A. § 33–24–7 or Georgia common law governing fraudulent procurement.

### 5. AFC Is Entitled To Recover Damages For Breach of Contract.

As set forth above, the court finds that Executive Risk has not met its burden of proof in this case whether viewed from the perspective of O.C.G.A. § 33–24–7 or fraudulent procurement under Georgia common law. *See* O.C.G.A. § 33–24–7; *Dills*, 243 S.E.2d at 552. None of the defendants made any material false representations, incorrect statements, or omissions to Executive Risk.

Because Executive Risk has not proven any ground sufficient to rescind the Policy, its rescission of the Policy on August 24, 2004, was improper. Its request for the court to enter a declaratory judgment finding that the rescission was proper is therefore denied, and Executive Risk's complaint seeking a declaratory judgment [Doc. No. 1] is dismissed with prejudice. Each of the defendants has asserted a counterclaim for breach of contract against Executive Risk. The evidence is undisputed that AFC paid all of the attorneys' fees and settlement funds related to the Underlying Actions on behalf of itself, its current and former officers and directors, and its Offering Underwriters. Accordingly, AFC is the only defendant with a claim for damages here. The counterclaims of the

other defendants in this case [Doc. Nos. 9–30] are accordingly dismissed as moot.[12]

### A. Compensatory Damages

With respect to AFC's counterclaim for breach of contract [Doc. No. 8], the court must determine the damages to be awarded to AFC. Under Georgia law, the damages recoverable for breach of contract "are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 13–6–2.

AFC has, to date, paid a total of $16,716,667 to settle the Underlying Actions. (Stip.Facts, ¶ 28.) The settlement agreement in the *AFC Securities Litigation* further obligates AFC to pay the Settlement Class in that case 60% of any amounts recovered against AFC's insurers, up to a maximum of $6, 000, 000. *Id.*, ¶ 29. The settlement amounts AFC has already paid and will be required to pay alone exceed the aggregate limits of the Policy ($20,000,000).

The evidence further established that AFC incurred attorneys' fees and expenses totaling at least $8,790,797 defending itself, its current and former officers and directors, and the Offering Underwriters from the claims made in the Underlying Actions. Mr. Tanenbaum, AFC's former general counsel and an attorney with broad experience, testified that he was intimately familiar with the settlement of the Underlying Actions, that he had reviewed all of the attorneys' fees and expenses, and that he believed the settlement amounts,

---

12. At the time the defendants filed their Answers and Counterclaims, the Underlying Actions had not been settled and, accordingly, all of the defendants asserted counterclaims for breach of contract. Now, after the Underlying Actions have been settled, it is undisputed that AFC paid all the attorneys' fees, expenses, and settlement costs on behalf of itself, its current and former officers and directors, and the Offering Underwriters. AFC is also the only party responsible for the future contingent liability of $6,000,000.

attorneys' fees, and expenses were all reasonable. Executive Risk offered no evidence to challenge the settlement amounts, attorneys' fees, or expenses incurred by AFC, nor did Executive Risk offer any evidence that the settlement amounts, attorneys' fees, or expenses were unreasonable, unnecessary, or collusive. The court finds that the settlement amounts, attorneys' fees, and expenses incurred by AFC were reasonable and necessary.

AFC has proven by a preponderance of the evidence that the Underlying Actions constituted claims under Insuring Agreements (B)(1), (B)(2), and (B)(3) of the Policy. It is undisputed that AFC, its current and former officers and directors, and AFC's Offering Underwriters (as to which AFC had a contractual indemnity obligation) were all named as parties in one or more of the Underlying Actions. Mr. Tanenbaum testified that the claims against AFC and the officers and directors exceeded $10,000,000, as did the claims against the Offering Underwriters, and that the settlements achieved a complete release of all such parties in all securities and derivative cases. Both separate $10,000,000 limits of the Policy were therefore implicated, and the evidence is clear that AFC expended far more than the total aggregate limits ($20,000,000) defending and settling the Underlying Actions.

Executive Risk's contention that AFC's damages must be "allocated" is without merit. Executive Risk offered no evidence at trial on how the settlement amounts, attorneys' fees, or expenses should be allocated. The evidence at trial instead established that the claims against AFC and its officers and directors and the claims against AFC's Offering Underwriters each separately exceeded $10,000,000. The Underlying Actions were all settled in a global settlement which provided for a complete release of AFC, its current and former officers and directors, and the Of-

fering Underwriters. *Id.* There is no practical way for the court to now go behind a global settlement given final approval by Judge Thrash (which Executive Risk had full knowledge of and did not object to) and attempt to "allocate" portions of the settlement under various insurance coverages. Claims were made implicating both separate $10,000,000 limits of coverage, and both limits of coverage were exhausted.

█ Having chosen to rescind the Policy, Executive Risk has no right to insist on allocation of the settlement amounts, attorneys' fees, or expenses. In Georgia, an insurer that refuses to indemnify an insured "waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of the settlement [within a policy's limits] made in good faith[,] plus expenses and attorneys' fees." *Southern Guaranty Insurance Co. v. Dowse,* 278 Ga. 674, 605 S.E.2d 27, 29 (2004). Executive Risk offered no evidence at trial that AFC's settlement of the Underlying Actions was collusive or in bad faith. Indeed, Mr. Spears confirmed that Executive Risk knew AFC was attempting to settle the Underlying Actions and voluntarily chose not to attend or participate in the mediation in which the settlements were reached:

Q. And you knew, because you had rescinded that Chubb had no standing or right to participate in that settlement or that mediation, didn't you?

A. *We did not. We would not have participated.*

Q. And you had no right to. You had walked away, you were through.

A. Legally, I don't know what the conclusion is on that. *But, yeah, we had no intention of going, yes.*

Q. *And you wouldn't have come to the mediation and tried to argue anything at all about how the settlement proceeds*

*should be allocated. You had no right to do that, didn't intend to do that, right?*

A. *We did not intend to attend the mediation.*

(Tr., p. 1057–1058) (emphasis added).

Executive Risk had the opportunity to protect the interests of its insureds and its own interests. It chose instead to stand by its rescission of the Policy. It cannot now insist that its insureds should have, in some fashion suitable to Executive Risk, allocated the settlement they reached to comply with an insurance policy Executive Risk has insisted does not exist. The court finds that AFC has established reasonable and necessary settlement costs, attorneys' fees, and expenses in excess of the limits provided by Insuring Agreements (B)(1) and (B)(2) of the Policy ($10,-000,000), and in excess of the limits provided by Insuring Agreement (B)(3) of the Policy ($10,000,000). The court accordingly finds that AFC is due $20,000,000 from Executive Risk by virtue of Executive Risk's breach of contract.

## B. *Prejudgment Interest*

O.C.G.A. § 7–4–15 provides that "[a]ll liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand." *See also Holloway v. State Farm Fire & Casualty Co.*, 245 Ga.App. 319, 537 S.E.2d 121, 125 (2000) (*citing Enfinger v. International Indemnity Co.*, 257 Ga. 385, 359 S.E.2d 884, 885 (1987)) ("When the only issue contested by the insurer is the existence of coverage and not the amount of the claim then the claim is properly liquidated."). An award of prejudgment

13. Alternatively, O.C.G.A. § 13–6–13 separately provides for the discretionary award of

interest for liquidated damages is mandatory rather than discretionary and is awarded as a matter of law. *Holloway*, 537 S.E.2d at 125. In the pretrial order [Doc. No. 270], AFC sought an award of prejudgment interest, and Executive Risk has not disputed AFC's right to recover such prejudgment interest.

■■■ Because of Executive Risk's breach of contract, AFC has been deprived of the use of $20,000,000 for more than two years, and it is therefore appropriate to award AFC prejudgment interest. Accordingly, pursuant to O.C.G.A. § 7–4–15, prejudgment interest is due to be awarded to AFC.[13] Calculated from August 27, 2004 (the filing date of this action and the date the contract was breached), prejudgment interest at the statutory rate of 7% per annum through June 29, 2007 totaled $3,973,698.32, and prejudgment interest continued to increase at the rate of $3,835.62 per day. Thus, AFC is entitled to a total of $4,295,890.40 in prejudgment interest.

## C. *Bad Faith*

In pertinent part, O.C.G.A. § 33–4–6 provides:

In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

prejudgment interest.

■ Even though Executive Risk is not entitled to rescind the Policy, the court concludes that Executive Risk had "reasonable and probable cause" for its coverage decision. That reasonable and probable cause may fall short of a complete defense to coverage, but it "vindicate[s] the good faith of the company as effectually as would a complete defense to the action." *Worsham v. Provident Companies, Inc.*, 249 F.Supp.2d 1325, 1341 (N.D.Ga.2002) (citation omitted). "If there is any reasonable ground for contesting the claim there is no bad faith and it is error to award penalty and attorney's fees." *Commercial Union Insurance Co. v. F.R.P. Co.*, 172 Ga.App. 244, 322 S.E.2d 915, 921 (1984) (citations omitted). The reasonableness of Executive Risk's coverage decision must be judged based on the facts appearing to Executive Risk at the time of its decision. "Where it appears from the evidence that the [insurer's] refusal to pay was justified on the basis of the facts appearing to the [insurer] at the time of the refusal, bad faith is not shown." *Royal Insurance Co. v. Cohen*, 105 Ga. App. 746, 125 S.E.2d 709, 712 (1962); *see also Lanier v. American Casualty Company of Reading, Pennsylvania*, 226 F.Supp. 630, 635 (N.D.Ga.1964) (whether insurer had "reasonable ground for contesting the claim is a matter which depends upon the circumstances existing when liability [was] declined or not admitted, not by the event of ultimate determination"). Thus, any bad faith alleged by AFC's counsel which occurred after the filing of the suit is not a basis for bad faith under O.C.G.A. § 33–4–6. *See Downer v. Georgia Farm Bureau Mutual Insurnace Co.*, 176 Ga.App. 641, 337 S.E.2d 422, 424 (1985) (denying bad faith penalties where "the alleged bad faith act occurred *after* claimants filed their lawsuit, and [there was] no evidence of bad faith *prior* to the filing") (emphasis in original).

■ Executive Risk's decision to rescind the Policy was reasonable because (1) the timing of the restatement announcement suggested that AFC might have known more about a possible restatement than it disclosed to Executive Risk before the inception of the Policy, and (2) after the restatement announcement, Executive Risk promptly initiated and conducted an investigation of the circumstances surrounding the issuance of the Policy, which reasonably led it to conclude that the Policy had been procured on the basis of material misrepresentations. AFC's lack of cooperation in that investigation reasonably added to Executive Risk's belief that AFC had been less than forthcoming in the negotiations for the Policy.

The disputed issues of fact with regard to this coverage determination further establish that Executive Risk's conclusion was not unreasonable or frivolous. *American Family Life Assurance Co. of Columbus, Georgia v. U.S. Fire Co.*, 885 F.2d 826, 834 (11th Cir.1989) ("[i]f the insurance company raises a ... disputed issue of fact in refusing to fulfill a contractual obligation ... the insurance company cannot have acted in bad faith as a matter of law"); *Worsham*, 249 F.Supp.2d at 1341 ("[w]here there is a disputed question of fact whether an insurer had 'a reasonable and probable cause for refusing to pay a claim,' bad faith penalties are not available under § 33–4–6").

The court therefore concludes that the defendants have failed to establish by a preponderance of the evidence that Executive Risk should be held liable for bad faith.

### Conclusion

Pursuant to the reasons stated herein, Executive Risk's motion to amend to conform to the evidence [Doc. No. 302] is hereby **DENIED**. Executive Risk's Com-

plaint seeking a declaratory judgment [Doc. No. 1] is hereby **DISMISSED WITH PREJUDICE,** and the counterclaims for breach of contract [Doc. nos. 9–30] asserted by the defendants other than AFC are hereby **DISMISSED AS MOOT.**

With respect to AFC's counterclaim for breach of contract [Doc. No. 8], and its amended counterclaim seeking bad faith penalties pursuant to O.C.G.A. § 33–4–6 [Doc. No. 256], the court hereby grants judgment in favor of AFC Enterprises, Inc. against Executive Risk Indemnity, Inc., and awards damages as follows:

(a) Compensatory damages in the amount of $20,000,000;

(b) Prejudgment interest in the amount of $4,295,890.40 ($3,973,698.32 through June 29, 2007, increasing at the rate of $3,835.62 per day);

(c) Post-judgment interest pursuant to 28 U.S.C. § 1961; and

(d) All costs of this action pursuant to Federal Rule of Civil Procedure 54(d).

The court therefore finds that AFC Enterprises, Inc. Is entitled to judgment against Executive Risk Indemnity, Inc. in the total amount of **$24,295,890.40.** Pursuant to Federal Rule of Civil Procedure 58, the Clerk is directed to enter judgment in favor of AFC Enterprises, Inc. as set forth herein.